UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Merchants Bank and Trust Co.,

    Plaintiff,

    v.                                        Case No. 1:06cv561

Cincinnati Insurance Co.,                    Judge Michael R. Barrett

    Defendant.

## OPINION & ORDER

This matter is before the Court upon the Parties' Motions for Summary Judgment (Docs. 25, 26)  The Parties have filed Responses in Opposition (Docs. 27, 30) and Replies (Docs. 31, 32)

**I.    BACKGROUND**

The facts giving rise to this dispute are undisputed.

Plaintiff Merchants Bank and Trust Company uses a third party, Jack Henry & Associates, to provide certain check handling services to the bank.  (Patterson Depo. at 10-11; Crosby Depo. at 28-30)  After processing the checks, Jack Henry & Associates transmits the items electronically to Merchants.  A software program then automatically pays or refuses to pay each item based on whether there are adequate funds. (Patterson Depo. at 12-13.1)

On December 17, 2003, Jack Henry & Associates received a cashier's check allegedly issued by MBT and payable to Richmond Motors in the amount of $159,200 from the Federal Reserve.  (Crosby Depo. at 28)  Jack Henry & Associates processed the cashier's check and sent the electronic information to Merchants.  Jack Henry & Associates

then forwarded the actual cashier's check to Merchants the next day. (Crosby Depo. at 26-29) However, by then the sum of $159,200 had been withdrawn from Merchant's cashier's checking account and transferred to US Bank, where the cashier's check had been deposited and negotiated.

Merchants discovered that the cashier's check was illegitimate when it reconciled its internal checking account. A Merchants employee noticed a discrepancy between the list of issued and outstanding cashier's checks and the list of cashier's checks that had cleared the bank's demand deposit account. (Karen Kuntz Depo. at 5-6) Further investigation revealed that the deposit slip for Check No. 07491 was in a different monetary amount ($25) than the face value of the cashier's check ($159,200). (Id. at 11-14) Another Merchants employee located the actual physical cashier's check and wrote "counterfeit check" and "forged signature" on the check. (Minges Depo. at 17-19, 25) On January 5, 2004, the cashier's check was then returned to the Federal Reserve in order for Merchants to obtain a credit in the amount of $159,200. (Id. at 26-28)

US Bank responded by submitting a "Bank's Claim of Late Return" to the Federal Reserve in an effort to recover the $159,200 that the Federal Reserve had credited back to Merchants account and debited from US Bank's account. (Kuntz Depo. at. 38-39; Exhibit 4) Merchants responded to US Bank's actions by submitting a "Check Adjustment Request" to the Federal Reserve as a disclaimer to the claim that Merchants had returned the Disputed Item late and to undo the credit by the Federal Reserve to US Bank in the amount of $159,200. (Id. at 40-49; Oetzel Depo. at 31)

On July 12, 2004, US Bank filed suit in this Court against Merchants to recover the $159,200. *See US Bank, NA v. The Merchants Bank and Trust Company*, Case No.

1:04cv536.  US Bank alleged that (1) Merchants failed to return a fraudulent cashier's check purportedly drawn on Merchants to the Federal Reserve within the time period required by the Uniform Commercial Code's "midnight deadline rule;" and (2) Merchants failed to notify US Bank of Merchants' intent to return the "counterfeit" cashier's check within the time required by Regulation CC, 12 C.F.R. § 229.33.

Merchants and US Bank reached a settlement of their dispute, and on May 18, 2006, Merchants paid $79,600 to US Bank, or one-half of the $159,200 disputed amount under the parties' settlement agreement.  (Fox Depo. at 59; Doc. 25, Patterson Decl. ¶¶5-7).  In that settlement agreement, both US Bank and Merchants acknowledged that the cashier's check was a "counterfeit check."  (Patterson Decl. ¶¶5-6)

During this time, Merchants had in effect a Depository Institutions Blanket Bond (the "Bond") issued by Defendant Cincinnati Insurance Company ("CIC").  (Doc. 1, Ex. A)  The Bond provide indemnity under certain "Insuring Agreements":

> D. FORGERY, ALTERATION AND UNAUTHORIZED SIGNATURES
>
> Loss resulting directly from
>
> (1) Forgery or alteration of, on or in any Negotiable Instrument (except an Evidence of Debt), Acceptance, withdrawal order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit;
>
> E. ALL RISK FORGERY
>
> Loss by reason of the Insured
>
> (a) having in good faith and in the usual course of business, whether for its own account or for the account of others, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability or otherwise acted upon any security, document, or other written instrument which proves to have been a forgery or to have been altered or raised or counterfeited or lost or stolen, or . . .

The Bond defines "forgery" as "the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose." A "negotiable instrument" means "any writing (1) signed by the maker or drawer; and (2) containing an unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer; and (3) is payable on demand or at a definite time; and (4) is payable to order or bearer." "Counterfeit" is defined as "an imitation which is intended to deceive and to be taken as an original."

The Bond also provides under General Agreement G that "[t]he Company shall indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a collectible loss under this bond in excess of any Deductible Amount."

On May 19, 2006, Merchants filed a timely sworn proof of loss with CIC to recover a sum of $133,535.65, which included the $79,600 paid to US Bank in settlement and an additional $53,935.65 in litigation costs and attorneys fees. On July 14, 2006, CIC denied coverage under the Bond.

Merchants filed this action seeking (1) a declaration that the claims asserted by US Bank are within the coverage of Insuring Agreement D and/or Insuring Agreement E of the Bond; (2) a money judgment for a portion of the $79,600 settlement that Merchants paid to US Bank to resolve US Bank's lawsuit; and (3) the award of reasonable attorneys' fees

and all costs associated with this action. CIC filed a counterclaim for declaratory judgment, seeking a declaration that none of the claims asserted by US Bank against Merchants were potentially within the coverage of any of the Insuring Agreements of the Bond.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

### B.    Insurance Contract Construction under Ohio law

The Parties agree that Ohio law governs this dispute. In Ohio, insurance policies are generally interpreted by applying rules of construction and interpretation applicable to basic contract law. *City of Sharonville v. Am. Employers Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006). A policy will be construed liberally in favor of the insured and strictly against

the insurer where the provisions at issue are reasonably susceptible of more than one interpretation. *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988). However, "the general rule of liberal construction cannot be used to create an ambiguity where one does not exist. If the terms of a policy are clear and unambiguous, a court must enforce the contract as written, giving words used in the contract their plain and ordinary meaning." *Monticello Ins. Co. v. Hale*, 284 F.Supp.2d 898, 901 (S.D.Ohio 2003) (citations omitted).

### C. Insuring Agreement D

Merchants argues that their loss is covered under Insuring Agreement D of the Bond because the cashier's check was a negotiable instrument which contained a forged signature, which resulted in a direct loss.

CIC argues that the loss is not covered under Insuring Agreement D because US Bank did not make any claim that Merchants was liable on the fraudulent cashier's check, but instead claimed damages caused by Merchants' violation of the "midnight deadline rule" and Regulation CC. While it is true that the Bond does not expressly provide for coverage due to such violations, there is nothing in the Bond which excludes such coverage. At most, it is ambiguous whether such coverage exists.

Next, CIC argues that in its Complaint, Merchants refers to the cashier's check as being counterfeit, and loss sustained on "counterfeit" checks is expressly excluded from the coverage of Insuring Agreement D. As the insurer, CIC bears the burden of proving the applicability of an exclusion in its policy. *Continental Ins. Co. v. Louis Marx Co.*, 415 N.E.2d 315, 317 (Ohio 1980). CIC relies on Exclusion P, which excludes "loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreement A, E, or F." The Bond defines counterfeit as "an imitation which is intended to deceive and

to be taken as an original." Merchants argues that it is not claiming a loss from counterfeiting, but it claiming loss due to a forged negotiable instrument.

The Court finds it unnecessary to resolve this issue at this time because the Court finds that Merchants has not sustained a "loss resulting directly" from a forgery of a negotiable instrument. While Insuring Agreements D and E cover similar and potentially overlapping categories of loss, Insuring Agreement D uses the "resulting directly" language, which creates a heightened causation standard. *Flagstar Bank, F.S.B. v. Federal Ins. Co.*, 2008 WL 162946, *4 (6th Cir. Jan. 18, 2008) (unpublished), *citing First National Bank of Manitowoc v. Cincinnati Insurance Co.*, 485 F.3d 971, 979 (7th Cir. 2007). The Court notes that Merchants was reimbursed by the FDIC for the full amount of the cashier's check, and did not sustain a loss until it agreed to pay US Bank $79,600 as part of the settlement agreement. However, these facts do not prevent coverage under the less stringent causation standard created by Insurance Agreement E. *Id.*, *citing Manitowoc*, 485 F.3d at 980.

### D. Insuring Agreement E

Merchants argues that Insuring Agreement E covers the loss because it acted in good faith when it acquired, received, gave value, extended credit, and otherwise acted on the cashier's check. Merchants also argues that the cashier's check was a forgery or a counterfeit, as those terms are defined in the Bond. The Bond defines forgery as "the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose." In support of its argument that the cashier's check was a forgery, Merchants cites to the Declaration of Donald Patterson, who is the president of Merchants and states that his signature was not

authorized on the cashier's check. (Doc. 25, Ex. C) However, It is not clear from Patterson's Declaration who signed the cashier's check. Patterson merely states that the signature was not authorized. The Bond defines counterfeit as "an imitation which is intended to deceive and to be taken as an original." A review of both documents plainly shows that the cashier's check meets this definition. (See Doc. 25, Ex. C, Patterson Decl., Ex. A)

However, CIC argues that Insuring Agreement E does not apply because it does not apply to cashier's checks. The Court finds that there is nothing in the language of the Bond which would exclude cashier's checks from coverage. Agreement E plainly applies to "any security, document, or other written instrument which proves to have been a forgery."

Next, CIC argues that US Bank's claim is based upon Merchants' failure to act in a timely manner, and had nothing to do with being deceived by a fraudulent document. To the extent that CIC is arguing that Merchants' loss was not a direct loss, the Court notes that Agreement E only requires that there be "loss by reason of the Insured having in good faith and in the usual course of business . . . extended any credit or assumed any liability or otherwise acted upon any security, document, or other written instrument which proves to have been a forgery . . ." Unlike Insuring Agreement D, there is no requirement that the loss be directly attributed to the forgery. The Court finds that giving the terms of this provision their plain and ordinary meaning, the undisputed facts show that Merchants acted upon a document which proved to have been a forgery. *See Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978) (explaining that where common words appear in a written instrument, they will be given their ordinary meaning unless "manifest absurdity

results or unless some other meaning is clearly intended from the face or overall contents of the instrument.").

Finally, CIC argues that Merchants did not act in good faith with regard to its duty to comply with the "midnight deadline rule" and Regulation CC. The Seventh Circuit has rejected a similar argument made by CIC in *First National Bank of Manitowoc v. Cincinnati Insurance Co.*, 485 F.3d 971, 978 (7th Cir. 2007).[1] In *Manitowoc,* the bank extended a line of credit to a used car dealership based upon receipt of car leases purportedly signed by customers. *Id.* at 974. The president of the dealership committed fraud by either submitting fictitious leases or altering the terms of real leases. *Id.* Under both scenarios, the president forged the customers' signatures. *Id.* After the president disappeared, the dealership defaulted on the loan. *Id.* The bank sought recovery under Insuring Agreement E of the same "Depository Institutions Blanket Bond" at issue here. *Id.* at 975.[2]

The Seventh Circuit found that the language "in good faith and in the usual course of business" did not create a duty to follow sound banking practices. *Id.* at 977-78. The court explained that while it must interpret the policy as a whole, "to interpret 'in good faith' and 'in the usual course of business' as together imposing a prerequisite normative standard of banking conduct ignores the independent meaning of each phrase." *Id.* at 978. The court noted that neither phrase was defined in the Bond, and CIC's corporate

---

[1] While the Seventh Circuit was applying Wisconsin law, the Court notes that the principles of insurance contract construction under Wisconsin and Ohio law are substantially similar in all relevant aspects. *See* 485 F.3d at 976-77.

[2] The Seventh Circuit explained that the Bond resembles an older version of the standard Bankers Blanket Bond. 485 F.3d at 977; see also Annotated Financial Institution Bond 5, 5 (Michael Keeley ed., 2d ed. 2004).

designee had conceded that the employees of the bank acted honestly and in good faith, with no knowledge of the fraudulent scheme. *Id.* The court also noted that even if the bank employees acted negligently, under Wisconsin law mere negligence on the part of an insured does not bar the insured from obtaining coverage under a Banker's Blanket Bond unless the negligence amounts to fraud or bad faith. *Id.* at 978, n.5.

The Seventh Circuit also found that the phrase "in the usual course of business" does not impose a particular standard of conduct. *Id.* at 978. The court noted that on its face, the phrase does not suggest a duty of care, but instead suggested a certain category of acts, such as those usually conducted in the banking business. *Id.* Therefore, the court interpreted the phrase to mean acting "upon the kinds of documents that it would normally act upon in its business, such as leases, checks, securities, etc., rather than documents outside that usual course." *Id.* at 979.

The Sixth Circuit has likewise rejected an argument that loss sustained as the result of forgeries was not covered because the real cause was the bank's "commercially unreasonable" conduct. *Union Planters Bank, N.A. v. Continental Casualty Co.*, 478 F.3d 759, 764 (6th Cir. 2007). In Union Planters, the bank suffered a multi-million dollar loss stemming from a mortgage lender's fraud. *Id.* at 761. The court noted that the insured's allegations – that the bank failed to verify information on the loans, to investigate the mortgage lender's credit, to inquire into the alleged property purchases, and to follow its procedures in its agreement with the mortgage lender – at the most establishes negligence on the part of the bank. *Id.* at 764. The court explained that negligence will not suffice to defeat coverage. *Id.* at 764-65, *citing First Nat'l Bank of Fort Walton Beach v. U.S. Fid. & Guar. Co.,* 416 F.2d 52, 57 (5th Cir.1969) ("Had negligence been intended as a good

defense to payment . . . it should have been set out in the agreement."); *see also King v. Nationwide Ins. Co.*, 519 N.E.2d 1380 (1988) (explaining that exclusionary language in an insurance policy must be clear and specific, otherwise "that which is not clearly excluded from the operation of such contract is included in the operation thereof."). Accordingly, the Court finds that under the language of the Bond, Merchants is only required to show that it acted upon the cashier's check "in good faith." As Merchants points out, CIC has admitted in discovery responses that Merchants acted in good faith with respect to the cashier's check. (Doc. 25, Ex. A) Moreover, as Patterson testified in his deposition, there was no reason as of December 18, 2003, for Merchants to know or suspect that the cashier's check was counterfeit. (Patterson Depo. at 54-57) Therefore, the Court concludes that Merchants' loss was covered by Insuring Agreement E.

### E. General Agreement G

Merchants argues that under the terms of the Bond, CIC is obligated to indemnify Merchants for both the amount paid to US Bank in the settlement and its litigation costs and attorneys' fees. After making certain calculations based upon language in General Agreement G, Merchants states that the amount CIC owes to Merchants is $116,759.81. Merchants also claims that under Ohio Revised Code § 1343.03, it is entitled to pre-judgment interest on this total amount.[3]

CIC argues that Merchants has included costs which are not covered under General

---

[3]Ohio Revised Code § 1343.03 provides that a plaintiff who recovers under breach of contract claims is entitled to an award of pre-judgment interest. The interest accrues at the rate specified in the contract or, in absence of such, the rate determined pursuant to Ohio Revised Code § 5703.47. Ohio Rev.Code § 1343.03(A). Merchants argues that the rate is that found in the statute because the Bond does not provide for a rate of pre-judgment interest.

Agreement G. Specifically, CIC argues that the following should not be included: (1) $1,699.50 in attorneys' fees which Merchants paid before the US Bank lawsuit was filed; (2) $5,314.00 in attorneys' fees related to Merchants' attempt to establish bond coverage;[4] (3) $11,842.73 for an expert witness; and (4) $6,205.00 in consulting fees for a law professor. CIC also argues that Merchants has not provided any independent evidence that the fees and expenses it has paid were reasonable or necessary.

The Court finds that an evidentiary hearing on this matter is necessary for a resolution of these issues.

### III. CONCLUSION

Based on the foregoing, Plaintiff Merchant Bank and Trust Company's Motion for Summary Judgment (Doc. 25) is hereby **GRANTED**; and Defendant Cincinnati Insurance Company's Motion for Summary Judgment (Doc. 26) is hereby **DENIED**.

The Final Pretrial Conference in this matter, previously scheduled for March 20, 2008 at 9:30 a.m. is hereby converted to telephone conference to discuss the evidentiary hearing on the issue of attorney fees due under General Agreement G of the Bond. Parties shall initiate contact with the Court by calling 513-564-7660 five (5) minutes prior to 9:30 a.m. All other previously scheduled dates are hereby **VACATED**.

**IT IS SO ORDERED.**

   /s/ Michael R. Barrett
Michael R. Barrett, Judge
United States District Court

---

[4] CIC relies on Exclusion V, which states in relevant part: "This bond does not cover . . . V. costs, fees and other expenses incurred by the Insured in establishing the existence of or amount of loss covered under this bond . . ."